# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| STATE FARM FIRE AND CASUALTY COMPANY, | Case No. 3:19-cv-243 |
| *Plaintiff*, | Judge Travis R. McDonough |
| v. | Magistrate Judge Debra C. Poplin |
| JENNIFER SALLEY, | |
| *Defendant*. | |

| | |
|---|---|
| STATE FARM FIRE AND CASUALTY COMPANY, | |
| *Plaintiff/Counter-Defendant*, | |
| v. | |
| AMELIA WIEAND and ENRIQUE OREJUELA, | |
| *Defendants/Counterclaimants*. | |

## MEMORANDUM OPINION

Before the Court are a motion for judgment on the pleadings filed by Defendants and Counterclaimants Amelia Wieand and Enrique Orejuela (collectively, the "Wieand Defendants") (Doc. 86), a motion for partial summary judgment filed by the Wieand Defendants (Doc. 90), and a motion for summary judgment filed by Plaintiff and Counter-Defendant State Farm Fire & Casualty Company ("State Farm") (Doc. 90). For the following reasons, the Wieand Defendants' motions will be **GRANTED** and State Farm's motion will be **DENIED**.

I.   BACKGROUND

The parties do not genuinely dispute the material facts underlying this case. Their only dispute is the legal significance of those facts.

Defendant Jennifer Salley moved to Knoxville, Tennessee, in July 2013. (Doc. 89, at 7.) In October 2014, she began caring for children not related to her under the business name OM Baby. (*Id.* at 7–8, 12.) At that time, she lived at 1211 Hollow Ridge Lane in Knoxville. (*Id.* at 8.) Her boyfriend, Tony Lee, owned the residence. (*Id.* at 8.) Salley paid rent with proceeds from her childcare business, however, and took out a $1 million renter's insurance policy through Josh Ellis, a State Farm insurance agent. (*Id.* at 9, 14) Although Salley had a Tennessee business license for OM Baby—previously a children's clothing store that she operated under the same name—she did not obtain a childcare-agency license despite changing her business license to reflect that she was operating a daycare. (*Id.* at 9–10.) Salley advertised her business on Facebook and Care.com. (*Id.* at 16.) She hired employees and cared for up to eight children per day, with a total of 19 children enrolled. (*Id.* at 16–17.) Salley then moved to an apartment complex, continued caring for up to six children without the help of employees, and updated her State Farm renter's policy to her new address. (*Id.* at 18–20.)

In April 2017, Salley accepted the Wieand Defendants' twin children, E.Gr.O. and E.Ga.O., into her daycare program. (*Id.* at 46.) She cared for them three days per week, from 5:00 a.m. to 6:00 p.m. (*Id.* at 46–50.) Around the same time, she renewed her renter's insurance policy, Policy No. 42-CR-F126-5 (the "Policy"), and changed the address to 8836 Fox Lonas

Road in Knoxville (the "Fox Lonas residence"). (*Id.* at 20; Doc. 81-2, at 2.) The Policy includes personal-liability coverage and provides, in pertinent part:

> If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** to which this coverage applies, caused by an **occurrence**, we will:
>
> 1. pay up to our limit of liability for the damages for which the **insured** is legally liable; and
>
> 2. provide a defense at our expense by counsel of our choice. We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend any claim or suit ends when the amount we pay for damages, to effect settlement or satisfy a judgment resulting from the **occurrence**, equals our limit of liability.

(Doc. 81-2, at 26 (emphasis in original).) "Insured" means the policyholder and certain other individuals. (*Id.* at 15.) "Occurrence" means "an accident, including exposure to conditions, which results" in "bodily injury" or "property damage." (*Id.* at 16 (emphasis removed).) "Bodily injury" means "physical injury, sickness, or disease to a person" including "required care, loss of services and death resulting therefrom." (*Id.* at 15.)

Relevant here, the Policy excludes three categories of injuries from its personal-liability provision:

> [1] **bodily injury** or **property damage** arising out of **business** pursuits of any **insured** or the rental or holding for rental of any part of any premises by any **insured** . . . [excluding] activities which are ordinarily incident to non-**business** pursuits; . . .[1]
>
> [2] **bodily injury** or **property damage** arising out of the rendering or failing to render professional services; . . .[2] [and]
>
> [3] any claim made or suit brought against any **insured** by:

---

[1] The "business exclusion."

[2] The "professional-services exclusion."

> (1) any person who is in the care of any **insured** because of child care services provided by or at the direction of:
>
>> (a) any **insured**;
>>
>> (b) any employee of any **insured**; or
>>
>> (c) any other person actually or apparently acting on behalf of any **insured**; or
>
> (2) any person who makes a claim because of **bodily injury** to any person who is in the care of any **insured** because of child care services provided by or at the direction of:
>
>> (a) any **insured**;
>>
>> (b) any employee of any **insured**; or
>>
>> (c) any other person actually or apparently acting on behalf of any **insured**.[3]

(*Id.* at 27–29 (emphasis in original).) The childcare-services exclusion contains an exception:

> This [childcare-services] exclusion does not apply to the occasional child care services provided by any **insured**, or to the part-time child care services provided by any **insured** who is under 19 years of age[.][4]

(*Id.* at 29 (emphasis in original).) "Business" means "a trade, profession, or occupation." (*Id.* at 15.) The Policy does not define "professional services," "childcare services," or "occasional." (*See generally id.*)

In May 2017, Salley moved into the Fox Lonas residence on a rent-to-own arrangement. (Doc. 89, at 20–23.) The property had an in-ground pool with a deck around it, but Salley delayed moving in to have gates installed on the stairs between the house and the pool and to build a wall around a concrete pad to create a play area. (*Id.* at 24.) After moving in, she had a

---

[3] The "childcare-services exclusion."

[4] The "exception."

4

Case 3:19-cv-00243-TRM-DCP   Document 109   Filed 03/10/21   Page 4 of 16   PageID #: 1093

lockable pet entrance installed on the back door for her three dogs. (*Id.* at 25–26.) Salley promptly began caring for four to six children regularly and eight to ten children on occasion as part of her OM Baby business. (*Id.* at 27–28.) When Salley watched more than four children at once, she had an assistant in the house. (*Id.*) Providing childcare services through OM Baby was her primary source of income. (*Id.* at 44.)

In January 2018, the Tennessee Department of Human Services ("Human Services") began investigating Salley's business. (*Id.* at 31.) On May 24, 2018, Salley entered an agreed injunction (the "injunction") with Human Services. (*Id.* at 38, 71–72.) The injunction stipulated that Salley had "operated a child care agency . . . without a valid license by keeping more than four (4) unrelated children in her home for more than three (3) hours per day" and "enjoined [her] from establishing, conducting, managing, or operating any place, home or facility of any kind constituting a child care agency without having an active license as required by law[.]" (*Id.* at 71.) Salley understood the injunction to mean that she could not care for more than "four kids at [her] house that were not related to [her]" without a license. (*Id.* at 39.)

After the injunction, Salley continued to care for no more than four children at any one time at the Fox Lonas residence, and this remained her primary source of income, although she also began selling hairbows online and working as a babysitter to generate additional income. (*Id.* at 44–45.) She stopped watching E.Gr.O. and E.Ga.O. as part of the reduction, but on June 21, 2018, Wieand texted Salley and asked if she could care for the twins on Friday, June 22, 2018. (*Id.* at 51.) Salley agreed, and also watched the twins for half of Saturday, June 23, and on a number of Fridays thereafter, including June 29, July 6, and July 13. (*Id.* at 50–55.)

On Friday, July 20, 2018, Wieand dropped E.Gr.O. and E.Ga.O. off at the Fox Lonas residence around 5:00 a.m. (*Id.* at 57.) Salley initially had the children, then twenty-three

5

months old, in her bed. (*Id.*; Doc. 70-1, at 1, 3.) She then moved them to their own room with a crib (or "Pack 'n Play," which is essentially a small crib or playpen) and left the door open because the air conditioning was broken. (Doc. 89, at 57–58.) Salley placed a baby gate across the door but did not go back to sleep.[5] (*Id.* at 58.) At 7:30 a.m., another child named Eleanor arrived. (*Id.*) Salley played with Eleanor in her own bedroom, where a window air conditioner was located, and then put her down for a nap at 9:40 a.m. (*Id.* at 58–59.) Wieand texted Salley at 9:00 a.m., but Salley did not immediately see the message because she was playing with Eleanor. (*Id.* at 59.) At 10:00 a.m., another mother arrived, let herself into the house, and brought a child named Mary Ann straight back to the bedroom area. (*Id.* at 59–60.) Salley immediately put Mary Ann down for a nap in another bedroom and then chatted briefly with her mother, who subsequently left. (*Id.* at 60.)

Salley then looked through the bedroom door where E.Gr.O. and E.Ga.O. should have been. (*Id.* at 60.) She saw they were not in the Pack 'n Play and began searching the house for them. (*Id.* at 61.) Salley could not find the twins in the house, so she looked outside, did not see them, and then re-entered the house and searched it again. (*Id.*) She looked outside and saw E.Gr.O. and E.Ga.O. in the pool. (*Id.* at 62.) Salley ran and jumped over the gate, pulled the twins out of the pool, and attempted to resuscitate them. (*Id.* at 62–63.) She called 911 and continued resuscitation until an ambulance arrived. (*Id.* at 63–64.) Both children died. (Doc. 70-2, at 12–13.)

In a subsequent criminal proceeding, Salley pled guilty to two felony counts of criminally negligent homicide. (Doc. 70-1.) She stipulated that the premises were kept in a dangerous

---

[5] It is unclear whether this fact is actually undisputed, but for present purposes, it makes no difference.

condition and that she failed to guard against the dangerous condition in a gross deviation from an ordinary standard of care. (Doc. 70-2, at 14.)

The Wieand Defendants sued Salley in state court (after dismissing without prejudice a similar case in this Court) and, in their operative pleading, allege premises liability, negligence per se, failure to supervise, and negligent infliction of emotional distress (the "underlying action"). (Doc. 65-1.)

State Farm sued the Wieand Defendants and Salley in this Court, seeking a declaratory judgment that it has no duty to defend and no duty to indemnify Salley in the underlying action. (Doc. 81.) The Wieand Defendants counterclaimed, seeking a declaratory judgment that State Farm has a duty to defend and indemnify Salley in the underlying action and that State Farm is estopped from denying coverage. (Doc. 83.)

The Wieand Defendants have moved for judgment on the pleadings as to whether State Farm has a duty to defend Salley in the underlying action. (Doc. 86.) State Farm and the Wieand Defendants have cross-moved for summary judgment as to whether State Farm has a duty to indemnify Salley in the underlying action. (Docs. 87, 90.) State Farm filed a consolidated response to the Wieand Defendants' motions (Doc. 96), and the Wieand Defendants responded to State Farm's motion (Doc. 97). The motions are ready for review.

II. STANDARD OF REVIEW

A. Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to

7

judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal quotation marks and citation omitted). A Rule 12(c) motion will not be granted when material facts are disputed, but can be used to resolve purely legal questions on the pleadings. *Cf. id.* at 583 (analyzing contract provisions on review of a Rule 12(c) motion because the "proper interpretation of a contract is a question of law").

### B. Summary Judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably

8

find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

It is "well-established . . . that '[i]nsurance policies are, at their core, contracts.'" *Garrison v. Bickford*, 377 S.W.3d 659, 663–64 (Tenn. 2012) (citation omitted). Courts therefore "interpret insurance policies using the same tenets that guide the construction of any other contract." *Id.* (citation omitted). "[T]he terms of an insurance policy should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties." *Id.* (quotation marks and citation omitted). "[T]he language in dispute should be examined in the context of the entire agreement" to ensure a reasonable construction of the whole policy. *Id.* (citations omitted).

"[C]ontracts of insurance are strictly construed in favor of the insured, and if the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls." *Id.* (citation omitted). But "a strained construction may not be placed on the language used to find ambiguity where none exists." *Id.* (quotation marks and citation omitted).

"An insurer's duty to defend is determined solely by an examination of the allegations of the underlying complaint." *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 439 (Tenn. 2012) (citations omitted). "[T]he insurer has a duty to defend when the underlying complaint alleges damages that are within the risk covered by the insurance contract and for which there is a potential basis for recovery," even if only "one of the allegations is covered by the policy" and the others are

9

not. *Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 305 (Tenn. 2007) (citation omitted). "The duty to defend is broader than the duty to indemnify because the duty to defend is based on the facts alleged, while the duty to indemnify is based upon the facts found by the trier of fact." *Id.* (citation omitted). Any doubt as to whether the underlying allegations fall "within the coverage of the policy is resolved in favor of the insured." *Id.* (citation omitted).

The Wieand Defendants maintain that State Farm must both defend Salley in the underlying action and indemnify her if she is found liable. State Farm maintains that injuries arising from Salley's care of E.Gr.O. and E.Ga.O. are not covered under the Policy's personal-liability coverage because of its exclusions for childcare services, professional services, and business pursuits, and because the harm suffered was primarily caused by the excluded conduct, not the non-excluded conditions of the property, State Farm has no duty to defend or indemnify Salley.

  **A.** **Duty to Defend**

The Wieand Defendants' complaint against Salley in the underlying action asserts multiple causes of action, several of which relate to Salley's alleged creation of dangerous conditions at the Fox Lonas residence and a causal connection between those conditions and the twins' deaths. (*See generally* Doc. 81-1 (alleging that the outdoor gates, fence, dog door, and absence of a pool alarm or cover were dangerous conditions).) It also omits some of the background recounted above. The Wieand Defendants' allegations in the underlying action do not provide a basis to conclude that an exclusion from coverage applies and relieves State Farm of its duty to defend. *See Clark*, 368 S.W.3d at 439 ("An insurer's duty to defend is determined *solely* by an examination of the allegations of the underlying complaint." (emphasis added)). For example, counts one and two in the underlying action allege that Salley failed to have

"reasonably safe gates" and "appropriately tall and reasonably safe fencing . . . surrounding the pool," which, combined with the absence of a pool cover or alarm, foreseeably caused the deaths of E.Gr.O. and E.Ga.O. (Doc. 81-2, at 6–9.) On the allegations presented, an exclusion does not unambiguously negate State Farm's duty to indemnify Salley for liability arising out of injuries caused by those conditions. Accordingly, under Tennessee law, State Farm has a duty to defend Salley in the underlying action.

### B. Duty to Indemnify

The Court presumes without deciding that Salley's daycare activities, including her care of E.Gr.O. and E.Ga.O. on July 20, 2018, were excluded from coverage under the Policy's childcare-services, professional-services, and business-pursuits provisions.

The Court can set aside whether these exclusions apply because "Tennessee recognizes the concurrent causation doctrine."[6] *Clark*, 368 S.W.3d at 441. The concurrent-causation doctrine "provides that there is insurance coverage in a situation 'where a nonexcluded cause is a substantial factor in producing the damage or injury, even though an excluded cause may have contributed in some form to the ultimate result and, standing alone, would have properly invoked the exclusion contained in the policy.'" *Id.* (quoting *Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 887 (Tenn. 1991)). In *Allstate*, the insurance policy excluded "bodily injury or property damage arising out of the ownership, maintenance, use, occupancy . . . loading or unloading of any motorized land vehicle or trailer." 811 S.W.3d at 884 (internal quotation marks omitted). The insured was attempting to remove "frozen" lugnuts from his truck to install new brake shoes. *Id.* A friend stopped by, saw the issue, and offered to use his torch to remove the lugnuts. *Id.* The

---

[6] If the exclusions do not apply, State Farm would have a duty to indemnify Salley in the underlying action. If the exclusions do apply, State Farm would still have a duty to indemnify Salley under the concurrent-causation doctrine, as will be seen below.

friend asked whether any flammable materials were in the garage, the insured said no, and the friend proceeded to apply his torch to the lugnuts. *Id.* Sparks flew across the floor and ignited a pan of flammable liquid five to ten feet away. *Id.* at 884–85. The insured picked up the pan, dropped it because of the heat, and inadvertently kicked it toward the friend, spraying the liquid onto him and causing burns. *Id.* at 885. The Tennessee Supreme Court adopted the concurrent-causation framework and held that the insurance policy covered the injury even though vehicle maintenance was excluded from the policy. *Id.* at 887. The Court reasoned:

> There is certainly no question that using the torch in the manner described here would constitute an excludable risk under the policy if standing alone. This does not mean, however, that we can simply ignore the presence of other causal factors involved—the placement of the flammable substance, [the insured's] purported failure to warn of the substance upon specific inquiry, and the negligence in dropping and kicking the burning liquid—all of which are insured risks that the insuror was willing to accept a premium for *and* are the acts that comprise the basis of the lawsuit[.]

*Id.* at 888 (emphasis in original). Indeed, "[t]he same harm could have resulted had [the friend] been cutting any number of objects in [the insured's] garage with the torch completely unrelated to the truck." *Id.* (citation omitted). "Coverage is not vitiated because the truck, or the area around it, was merely the situs of the purported negligence." *Id.*; *see also Planet Rock, Inc. v. Regis Insurance Co.*, 6 S.W.3d 484 (Tenn. Ct. App. 1999) (holding that the concurrent-causation doctrine required coverage notwithstanding an assault-and-battery exclusion when one bar patron knocked another unconscious in an outside fight, after which bar employees brought the unconscious patron in and placed him on a couch without observation or contacting medical personnel, and the patron died).

Here, as in *Allstate*, Salley's provision of childcare services—the subject of a coverage exclusion—set the stage for the injuries at issue in the underlying action. Just as the friend in *Allstate* would not have been in harm's way without the need to perform maintenance on the

truck (an excluded activity), the twins would not have been at Salley's residence if not for her provision of childcare services (an allegedly excluded activity). But just as the friend in *Allstate* could have been exposed to concurrent dangers arising from the flammable substance by using the torch for covered purposes, so too could the twins have been exposed to the concurrent dangers of Salley's residence regardless of whether they were there for childcare services or another, covered purpose. Salley's installation of the dog door and failure to lock it while children were in the house, combined with an improper fence and gate and the absence of a pool alarm or cover, are non-excluded risks that concurrently caused these injuries. (Doc. 70-2, at 14 (Salley stipulating during plea that "the premises . . . were in . . . a dangerous condition and that she failed to guard against that condition," and in so doing, "satisfied the elements of criminally negligent homicide"); *cf. Allstate*, 811 S.W.2d at 888 ("[S]imply because there might arguably be a mere connection between [the excluded cause] and the ultimate harm, does not justify a finding of no coverage when other causal factors played a substantial role in producing the loss complained of[.]"). Indeed, the non-excluded risks were a danger presumably to any child in Salley's house who might be there for any reason, such as a social visit by a family with children or a genuinely occasional (and therefore excepted from the exclusion) babysitting situation. *Cf. Allstate*, 811 S.W.2d at 888 ("The same harm could have resulted had [the friend] been cutting any number of objects in [the insured's] garage with the torch completely unrelated to the truck."). Accordingly, under Tennessee law, State Farm has a duty to indemnify Salley in the underlying action.

State Farm relies primarily on *Capitol Indemnity Corp. v. Braxton*, 24 F. App'x 434 (6th Cir. 2001). There, the Sixth Circuit held in an unpublished opinion that a policy's automobile exclusion barred coverage when a daycare operator transported children in a van, failed to

remove one child from the van, and the child died from overheating. *Id.* at 442–43. In so doing, it construed *Allstate* and another pre-*Allstate* Tennessee Supreme Court case to mean that "if the use of the vehicle was the *efficient and predominate cause* of the injury, then the automobile exclusion is triggered and the insured is under no duty to indemnify." *Id.* at 442 (emphasis in original). The Court has been unable to identify any post-*Allstate* Tennessee state court cases that use an "efficient and predominate cause" standard in this context. Likewise, the Court cannot identify any Tennessee state court cases that follow *Capitol Indemnity*. In fact, the lower-court decision that the Tennessee Supreme Court reversed in *Allstate* used an "efficient and predominant[7] cause" analysis to conclude that the exclusion barred coverage, which strongly suggests that such an approach risks running afoul of *Allstate* itself. *See Allstate Ins. Co. v. Watts*, No. 13872, 1990 WL 95572, at *7 (Tenn. Ct. App. July 12, 1990) ("It is clear from the facts in the instant case that the maintenance of the vehicle in question[—]the use of the cutting torch on the lug bolt[—]was the efficient and predominating cause of the loss ([the friend's] injuries) and clearly falls within [the policy's] exclusion."), *rev'd by Allstate*, 811 S.W.2d 883; *see also Ray Indus., Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 758 (6th Cir. 1992) (noting that federal courts must "apply the law of the state's highest court" when deciding state-law issues). Regardless, even the reasoning underlying *Capitol Indemnity* ultimately cuts against State Farm. The decision focuses on the van's status as the "instrumentality of the injury" and explains that the "purported non-vehicular causes . . . [were] in fact vehicle-related" because the alleged "failure to take roll, count heads, or ascertain whether the children had been *removed from the van* all relate[d] to [the operator's] failure to remove" the child from the van. *Capitol Indem.*, 24

---

[7] While *Capitol Indemnity* used the term "predominate," the Court also searched for "predominant" to ensure that minor spelling differences would not obscure relevant case law.

F. App'x at 443. Here, the instrumentality of the injury was the pool at the Fox Lonas residence, and the non-excluded causes asserted by the Wieand Defendants relate to whether a young child could access the pool undetected. Although these risks manifested in the context of childcare services (just as the fire in *Allstate* manifested in the context of vehicle maintenance), they could just as easily have manifested through the presence of any child at the residence, whether a participant in Salley's childcare services or not. *Capitol Indemnity*, then, does not obviate State Farm's duty to indemnify Salley.

State Farm also argues that being required to indemnify Salley under these circumstances renders the childcare-services exclusion meaningless. Indeed, as this case illustrates, the concurrent-causation doctrine can drastically narrow the applicability of insurance-policy exclusions. But, while sitting in diversity, this Court merely applies the law of Tennessee, and Tennessee courts have been relatively clear on this issue for nearly three decades. Indeed, while the posture of this case is a bit complex, the operative legal issues are not. Non-excluded risks concurrently and substantially caused the deaths of E.Gr.O. and E.Ga.O. Under Tennessee law, no more is required to trigger State Farm's duty to indemnify.

## IV.     CONCLUSION

For the reasons above, the Wieand Defendants' motions for judgment on the pleadings (Doc. 86) and partial summary judgment (Doc. 90) are **GRANTED**. State Farm's motion for summary judgment (Doc. 87) is **DENIED**. The operative pleadings assert claims that are not resolved by these motions, however, so the Court will not enter judgment at this time. It appears that this order nevertheless resolves the primary legal contentions of the parties. If so, it is no longer appropriate for this Court to exercise jurisdiction for purposes of rendering declaratory

15

Case 3:19-cv-00243-TRM-DCP Document 109 Filed 03/10/21 Page 15 of 16 PageID #: 1104

judgment.[8]  The parties are therefore **ORDERED** to show cause on or before April 9, 2021, why the Court should not enter declaratory judgment reflecting the conclusions above and dismiss this action.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

---

[8] The parties have not argued in their present dispositive motions that the Court should decline to exercise declaratory-judgment jurisdiction.  *See United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 396 (6th Cir. 2019).  In any case, the factors that the Court must consider support the exercise of jurisdiction in this case.  *See id.*  State Farm is not a party to the underlying action, and whether it is obligated to provide defense or indemnification in that action turns on undisputed facts, the legal meaning of which are amenable to resolution by this Court.  Moreover, the parties' cross-dispositive motions—which seek relief on the merits of the legal contentions at issue—show that this is not mere procedural fencing or a race to res judicata.  Accordingly, entry of declaratory judgment is appropriate.